**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MR. JAMES DAWSON** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.  08-7** |
| | : | |
| **MR. FREDERICK HARRAN, Individually** | : | |
| **and in His Official Capacity as Bensalem** | : | |
| **Township Director of Public Safety, MR.** | : | |
| **STEVEN MORAN, Individually and in His** | : | |
| **Capacity as FMR. Director of Public Safety,** | : | |
| **BENSALEM TOWNSHIP** | : | |
| **Defendants.** | : | |

**DuBOIS, J.**                                                                                           **August 06, 2009**

# M E M O R A N D U M

## I.      Introduction

Plaintiff James Dawson initiated the instant lawsuit as a result of being terminated from his position as a probationary police officer with Bensalem Township ("the Township") Police Department. The following counts of the Complaint remain in the case: race discrimination in violation of Title VII of the Civil Rights Act of 1964 and 1991 ("Title VII"), 42 U.S.C. § 2000e (Count I); race discrimination in violation of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. § 955(a) (Count II); and violation of plaintiff's contractual rights as an employee on account of his race contrary to 42 U.S.C. § 1981(a) (Count III). The Township is named as defendant in all counts; Frederick Harran, formerly the Deputy Director of Public Safety for the Township, and Steven Moran, formerly the Director of Public Safety for the Township, in their individual capacities, are named as defendants in Count III.

Presently before the Court is defendants' Motion for Summary Judgment. For the reasons that follow, the Court grants defendants' Motion for Summary Judgment with respect to all

remaining counts.

## II.     Background

Plaintiff, an African-American, was hired as a probationary police officer with the Township on August 16, 2004. (Dawson Appointment Letter, May 26, 2004, Ex. 2 to Defs.' Mot.) As is the case for all new officers, plaintiff's appointment to a permanent position was contingent upon successful completion of a one year probationary period beginning from the date of his initial appointment. (Id.; Field Training Program Description 1, Jan. 31, 1997, Ex. 3 to Defs.' Mot.) During the first eight to twelve weeks after their hire, probationary police officers in the Township participate in a Field Training Program, which seeks "to instill proper attitudes, work habits, teach patrol tactics and knowledge of procedures" and is "designed to improve the officer's performance and the quality of service to the community while providing a measurable means of supervising and evaluating a new officer." (Field Training Program Description 1.)

While in the Field Training Program, plaintiff was evaluated by Officer William McVey, Officer Thomas Jackson, and Officer Todd Shapiro (Weekly Observation Report, Sept. 26, 2004, Ex. 9 to Defs.' Mot.; Weekly Observation Report, Oct. 10, 2004, Ex. 10 to Defs.' Mot.; Weekly Observation Report, Oct. 27, 2004, Ex. 11 to Defs.' Mot.) These evaluations were reviewed by Patrol Sargeant Joseph Blickley ("Blickley"). (Joseph Blickley Aff. ¶ 5, Nov. 25, 2005, Ex. 5 to Defs.' Mot.) After completion of the Field Training Program and for the remainder of the probationary period, Blickley supervised plaintiff and one other officer—Officer Timothy Taylor, who is Caucasian—as they were assigned to Blickley's squad. (Joseph Blickley Dep., 9:1–12:20, July 28, 2008, Ex. 4 to Defs.' Mot.) As a squad leader, Blickley was responsible for "monitor[ing] and review[ing] the performance of [the] probationary officers" under his

2

supervision and to recommend whether they should be promoted to a permanent position as police officers with the Bensalem Township Police Department. (Blickley Aff. ¶ 4.)

Plaintiff's evaluations during the initial twelve-week Field Training Program demonstrate that, on a scale of one to seven from worst to best, plaintiff consistently received scores in the four to six range, and plaintiff's overall performance was categorized as "satisfactory" as opposed to "unsatisfactory." (See Weekly Evaluation Reports, Exs. 9–12 to Defs.' Mot.) He received positive feedback in certain areas, but the reports also enumerated areas in which plaintiff could improve, such as radio communications, avoiding distractions, time spent writing reports, and time spent on his cell phone. (Id.)

On June 1, 2005, Blickley completed a Probationary Review Performance Evaluation that rated plaintiff as "standard" overall, meeting standards with respect to most position performance factors, except as to planning and organization, as to which he received a "below standard" rating. (Blickley Probationary Review Performance Evaluation Report, June 1, 2005, Ex. 13 to Defs.' Mot.) In this report, Blickley highlighted plaintiff's need to: "increas[e] his productivity;" "maintain[] an up to date [sic] schedule;" "report[] for special details, training, court, etc.;" avoid scheduling conflicts; "continue learning things such as policies and procedures;" "be as active and proactive as possible;" and learn how to prioritize tasks, such as responding to radio calls instead of spending too much time "on an assignment that could easily have been pushed aside or finished later." (Id.) "In conclusion," Blickley wrote, "[plaintiff] meets the standards of a patrol officer but . . . has the potential to be more successful by simply making an effort to be more active and productive . . . to be a well rounded [officer]." (Id.)

On June 3, 2005, defendant Harran and Blickley met with plaintiff. (James Dawson Dep.

3

69:19–21, Aug. 1, 2008, Ex. 7 to Defs.' Mot.; Harran Memo. to File, June 6, 2005, Ex. 16 to

Defs.' Mot.) At the meeting, plaintiff was informed of areas in which he had to improve, such as

"get[ting] more involved in incidents and arrests while working," being "more self-initiated," and

organizing his schedule so that he would "not be late for training." (Harran Memo. to File;

Dawson Dep. 70:10–12, 71:18–22.) On August 4, 2005, Blickley wrote a memorandum to

defendant Harran, noting improvements in plaintiff's productivity and scheduling and expressing

areas of continued concern with regard to plaintiff's performance. (Blickley Memo. to Harran,

Aug. 4, 2005, Ex. 17 to Defs.' Mot.) In this memorandum, Blickley concluded that plaintiff "has

successfully completed his probationary period . . . ." (Id.)

  Thereafter, plaintiff was involved in a series of incidents that, according to Blickley,

"were serious in nature and that were serious problems with [plaintiff's] work performance,"

causing Blickley to change his mind about plaintiff's performance and rescind his

recommendation that plaintiff be appointed to a permanent position. (Blickley Dep. 44:2–14.)

One incident occurred on August 5, 2005 when plaintiff responded to a call on Linconia Avenue

("the Linconia Avenue Incident"). A male suspect had broken into a residence, armed himself

with a knife, and fled on foot while bleeding. (Blickley Memo. to Moran, Aug. 8, 2005, Ex. 18 to

Defs.' Mot.) In the course of responding, plaintiff completed a police report, which Blickley

found to be so deficient in pertinent information that he wrote to defendant Moran, requesting

disciplinary action be taken against plaintiff. (Id.; Dawson Dep. 122:10–125:24.)

  On the heels of this incident, Blickley learned additional facts with regard to an incident

that had occurred on July 22, 2005 ("the Missed Fire Call Incident"). (Blickley Dep. 63:10,

65:3–20.) On that date, plaintiff responded to a burglary call and turned down his police radio

4

while securing the premises. (Dawson Dep. 153:25–155:3.) In turning down his police radio, he missed a call concerning a fire occurring nearby. (Blickley Dep. 66:19–68:2.) When approached by Blickley about missing the fire call, plaintiff explained to Blickley that he had turned down his police radio in order to secure the premises—an explanation that Blickley found to be "acceptable." (Id.)

However, after the Linconia Avenue Incident, Blickley "actually received the radio call printout and times from the Bucks County Police Radio Center." (Id. at 68:21–24.) Upon reviewing those records, Blickley discovered that "when [plaintiff] had gotten on the radio and asked about the fire, ten minutes had already passed since he reported to the dispatcher that he was okay" and had cleared the premises for security purposes. (Id. at 69:1–19.) The inaccuracy of plaintiff's initial explanation coupled with the "10 minutes of just sitting there and waiting for the emergency key holder to respond" instead of responding to an urgent fire call troubled Blickley. (Id.)

In addition, on August 10, 2005, only days after having been brought up for disciplinary action based on the Linconia Avenue Incident, plaintiff was approached by Blickley about having failed to respond to another radio call at the Lincoln Motel ("the Lincoln Motel Incident"). According to plaintiff, another officer responded, so he "figured as long as . . . another officer was en route, then there was no need for me to go over the air." (Dawson Dep. 170:5–11.) Blickley reviewed the radio transmission records and, finding that plaintiff failed to go over the radio over the course of three minutes to notify others that he was responding, concluded that plaintiff's conduct presented a "serious officer safety concern[]." (Blickley Memo. to Harran, Aug. 13, 2005, Ex. 20. to Defs.' Mot.)

5

Finally, on August 15, 2005, plaintiff was involved in two additional incidents that

further distressed Blickley. First, in the early afternoon, plaintiff reported to an attempted suicide

call ("the Attempted Suicide Call Incident"), but completed a police report that Blickley deemed

"woefully insufficient" for failure to include critical information, such as the fact that the person

attempting suicide was thirteen years old. (Blickley Aff. ¶ 15(d).) Second, late in the evening,

plaintiff spent two hours at police headquarters completing a police report for a DUI car accident

instead of responding to numerous other calls that were going out over the police radio during a

heavy rainstorm. (Id. ¶ 15(a); Dawson Dep. 190:2–193:21.) According to Blickley, the fact that

plaintiff was "sitting at headquarters during the busy time, listening to the police radio and not

putting his report aside, was unacceptable." (Bickley Memo. to Harran, Aug. 15, 2005, Ex. 23 to

Defs.' Mot.)

On the same date, August 15, 2005, Blickley wrote a final report to defendant Harran,

summarizing his decision to rescind his recommendation that plaintiff pass probation as follows:

> I apologize for and take back any impression that I may have given you as far as
> my not having a solid opinion on what administration should do with [plaintiff]. It
> is difficult to form a solid opinion of him because he always has an answer and
> excuse for everything and he actually did show signs of improvement and
> understanding of what needs to be done around here. After this weekend, I am
> done with him. He was called in for discipline less than a week before his
> probation ends and nothing has changed. . . . I have talked to him and counseled
> him repeatedly (especially in the past 2 weeks . . . ) and still, he writes reports like
> the one's [sic] I have submitted to you. I cannot understand or explain why, after
> showing signs of improvement and a little bit of motivation, these things would
> happen just as his probation is coming to an end and he has been made aware of
> some problems.

(Blickley Memo. to Harran, Aug. 15, 2005, Ex. 24 to Defs.' Mot.)

Defendant Moran accepted Blickley's recommendation that plaintiff not be offered a

permanent position. (Steven Moran Aff. ¶ 14, Oct. 22, 2008, Ex. 8 to Defs.' Mot.) Defendant

Moran then met with plaintiff, Blickley, and defendant Harran to inform plaintiff that, because of

these specific incidents, plaintiff did not pass his probationary period and would be terminated.

(Id.) Plaintiff was terminated from his employment with the Bensalem Township Police

Department on August 15, 2005. (Perry Ferrara Dep. 19:16–17, Aug. 5, 2008, Ex. 32 to Defs.'

Mot.)

On September 30, 2005, plaintiff filed a Charge of Discrimination with the Equal

Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations

Commission ("PHRC"), alleging unlawful termination on the basis of race. (Charge of

Discrimination, Sept. 30, 2005, Ex. B to Defs.' Mot. Dismiss.; Ferrara Dep. 19:16–17.) Plaintiff

filed the instant Complaint on January 2, 2008. On January 24, 2008, defendants filed a Motion

to Dismiss Pursuant to Rule 12(b)(6), F.R.C.P. By Order and Memorandum of May 5, 2008, the

Court: 1) dismissed with prejudice Counts IV through IX of the Complaint; 2) dismissed with

prejudice Count III against defendants Harran and Moran in their official capacities; and 3)

dismissed with prejudice plaintiff's claims for punitive damages in Counts I through III.

Plaintiff's only remaining claims on summary judgment are for race discrimination under

Title VII (Count I), race discrimination under the PHRA (Count II), and discriminatory violation

of his contractual rights under § 1981(a) (Count III).

## III.   Legal Standard

A court should grant summary judgment if "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp.

v. Catrett, 477 U.S. 317, 322 (1986).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is material when it "might affect the outcome of the suit under the governing law." Id. In considering a motion for summary judgment, the "facts must be viewed in the light most favorable to the party opposing summary judgment." Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations, or suspicions" to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).

## IV.   Discussion

### A.   Title VII and PHRA Claims (Counts I and II)

For claims of employment discrimination on the basis of race, the familiar framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), applies.[1] The Supreme Court further explained the framework in Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252 (1981):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, non discriminatory reason for the employee's rejection." . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

---

[1] The Title VII framework applies to analysis of claims under the PHRA as well. See Gomez v. Allegheny Health Servs. Inc., 71 F.3d 1079, 1083–84 (3d Cir. 1995) ("Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act, prohibit discrimination in employment based on race or national origin. The state Act is construed consistently with interpretations of Title VII.").

Id. at 252–53 (quoting McDonnell Douglas, 411 U.S. at 802) (citations omitted).

For suits challenging adverse employment actions, in order to prove a *prima facie* case of discrimination, plaintiff must establish by a preponderance of the evidence that: 1) plaintiff is a member of a protected class; 2) plaintiff was qualified for his position; 3) plaintiff suffered an adverse employment action; and 4) the circumstances of his discharge permit an inference of unlawful discrimination. Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).

The parties do not dispute that plaintiff has established the first three elements of a *prima facie* case of discrimination. Defendants argue, however, that plaintiff has failed to satisfy the fourth element. Specifically, defendants contend that the circumstances surrounding plaintiff's discharge do not permit an inference of discrimination because plaintiff cannot demonstrate that any similarly situated employees not within his protected class were treated more favorably than plaintiff. (Defs.' Mot. 26.) Rather, defendants point out that Timothy Taylor, a Caucasian probationary officer who was similarly situated to plaintiff—notably, the only probationary officer other than plaintiff who was in Blickley's squad and being supervised by Blickley—was terminated by the Township (before plaintiff was terminated) based on Blickley's recommendation that he not pass probation. (Id. at 34.) According to defendants, the appropriate inference from these circumstances, if any, is that "Blickley is a poor supervisor, not that he or any of the [d]efendants had any racial animus." (Id.)

Plaintiff counters that the circumstances of his termination permit an inference of discrimination because after a year of positive evaluations of his satisfactory work, plaintiff was nonetheless terminated. (Pl.'s Resp. 15–16.) In support of this position, plaintiff makes a host of arguments, which can be summarized as follows: 1) similarly situated Caucasian employees were

treated more favorably than plaintiff; 2) the fact that Blickley changed his mind about whether to recommend that plaintiff pass probation suggests a discriminatory motive; and 3) defendant Moran made a discriminatory comment to plaintiff.

After careful review of the record on summary judgment, the Court concludes that plaintiff has failed to prove by a preponderance of the evidence circumstances that give rise to an inference of discrimination. Thus, because plaintiff cannot make out a *prima facie* case of discrimination, the Court grants defendants' Motion for Summary Judgment with respect to Counts I and II of the Complaint.

### 1.    The Record Contains No Evidence That Similarly Situated, Non-Minority Employees Were Treated More Favorably Than Plaintiff

"Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside of the relevant class." Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999). In order to be considered "similarly situated" to plaintiff, the individual must "have engaged in the same conduct as plaintiff, 'without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Fullard v. Argus Research Labs., Inc., No. 00-509, 2001 WL 632932, *8 (E.D. Pa. June 6, 2001) (quoting Bullock, 71 F.Supp. 2d at 489). Moreover, "similarly situated" individuals "'must have dealt with the same supervisor [and] have been subject to the same standards . . . .'" Elgabi v. Toledo Area Regional Transit Authority, 228 Fed. Appx. 537, 541 (6th Cir. 2007) (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)).

In his Response to defendants' Motion for Summary Judgment, plaintiff points to Officer

Michael Rihl ("Rihl") (Caucasian), Officer Kevin Cornish ("Cornish") (Caucasian), Officer

Thomas Jackson ("Jackson") (Caucasian), and Blickley (Caucasian) as similarly situated

employees who were treated more favorably by defendants. (Pl.'s Resp. 4–5.) In addition,

plaintiff asserts that he was never offered remedial training or extended probation in order to

improve his performance—opportunities afforded to other, non-minority officers. (Id. at 11.))

        However, the factual record at summary judgment does not support plaintiff's

contentions. Rihl is not similarly situated to plaintiff because, *inter alia*, he did not have the same

supervisor as plaintiff. (Frederick Harran Aff. ¶ 9, Oct. 17, 2008, Ex. 21 to Defs.' Mot.)

Likewise, Cornish is not similarly situated to plaintiff because, *inter alia*, he had been working as

a police officer with the Township for five years and left the Township Police Department for

one year to work with the secret service. (Id. ¶ 7.) Cornish's greater level of experience with the

Township suffices to demonstrate that he is not similarly situated to plaintiff. See Parsia v. Allied

Tube & Conduit Corp., No. 07-2436, 2009 WL 750191, *10 (E.D. Pa. Mar. 19, 2009) (finding a

co-worker who had been employed for "a vastly longer time period" by defendant was not

similarly situated to plaintiff).

        With respect to Jackson, there is no evidence on the record to suggest that he shared the

same supervisor as plaintiff or was otherwise similarly situated to plaintiff. Finally, there is no

basis for comparing plaintiff with Blickley as Blickley was plaintiff's supervisor, not his

counterpart. See id. (finding an employee who "held a more senior management position than

plaintiff" not to be similarly situated to plaintiff). Thus, the Court rejects plaintiff's argument that

he was treated less favorably than similarly situated employees not within his protected class.

        With respect to plaintiff's contention that he was never offered remedial training or

extended probation, which were opportunities that other, non-minority officers were afforded,

plaintiff has failed to point to a single piece of evidence supporting his position. Namely, plaintiff

has not presented any evidence of other officers who received remedial training or extended

probation. As the Supreme Court has stated often and uncontroversially, "there is no issue for

trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict

for that party. If the evidence is merely colorable . . . summary judgment may be granted."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted). Accordingly, the

Court rejects plaintiff's argument as unsubstantiated by the record.

### 2. Blickley's Decision to Rescind Recommendation of Plaintiff Does Not Give Rise to an Inference of Discrimination

While preferable treatment of similarly situated employees not within plaintiff's protected

class may give rise to an inference of discrimination, such evidence is not the only means of

producing such an inference. "[A] plaintiff need not prove, as part of her prima facie case, that

she was replaced by someone outside of the relevant class." Pivirotto v. Innovativ Sys., 191 F.3d

344, 353 (3d Cir. 1999). Rather, evidence of other circumstances demonstrating that the adverse

employment action was "based on an illegal discriminatory criterion" is sufficient to meet

plaintiff's burden. Id. at 356 (quoting O'Connor v. Consolidated Coin Caterers Corp., 517 U.S.

308, 312 (1996)).

In this case, plaintiff points to the fact that Blickley changed his mind in ten days with

respect to whether plaintiff should pass probation. Plaintiff argues that this change of mind

suggests a discriminatory motive for several reasons. First, plaintiff contends that Blickley

changed his mind because plaintiff filed a Charge of Discrimination with the EEOC. "After

[p]laintiff had filed his EEOC charge, Sgt. Blickley changed his entire story and signed an

Affidavit," which described a "sudden discovery of deficiencies" in plaintiff's

performance—deficiencies about which plaintiff was never advised. (Pl.'s Resp. 17–18.) The

Court rejects this argument because plaintiff filed his Charge of Discrimination with the EEOC

on September 30, 2005—several weeks after Blickley decided to rescind his recommendation

between the 4th and 15th of August, 2009. (Charge of Discrimination.) Thus, plaintiff's filing of

a Charge of Discrimination could not have caused Blickley to change his mind about plaintiff's

eligibility for a permanent position.

Second, plaintiff asserts that Blickley "admitted to [p]laintiff less than two (2) weeks

before he was fired . . . that [d]efendant Moran and [d]efendant Harran ordered Sgt. Blickley to

begin to look for after-the-fact mistakes [p]laintiff made." (Pl.'s Resp. 12.) Plaintiff claims that

Blickley was told: 'Because of what happened with Tim Taylor, make sure you document

everything that Officer Dawson does.'" (Pl.'s Supplemental Interrogs. 2, Ex. 34 to Defs.' Mot.)

According to plaintiff, this comment constituted "order[ing] the documentation on [plaintiff] to

be increased," thereby suggesting a discriminatory motive the part of defendants. (Id.; Pl.'s

Interrogs. 6, Apr. 14, 2008, Ex. 38 to Defs.' Mot.; Dawson Dep. 96:11–97:11, 106:2–107:23;

Pl.'s Resp. 12.)

The Court rejects this argument because, taking the facts in the light most favorable to

plaintiff, the non-moving party, such a comment cannot, without more, give rise to an inference

of discrimination. Timothy Taylor is a Caucasian probationary officer who was terminated

because of poor performance. (See Blickley Aff. ¶ 11; Probationary Review of Timothy Taylor,

Jan. 24, 2005, Ex. 29 to Defs.' Mot.) A comment by defendant Moran advising Blickley to

document thoroughly plaintiff's performance in light of a recent termination of another employee

is not inconsistent with an intent to be cautious, reasoned, and even-handed in the Police Department's approach to employee evaluations. Notably, and contrary to plaintiff's contention, defendant Moran's comment does not specify whether documentation of positive or negative performance should be increased; arguably, this instruction could require additional documentation of positive performance. In addition, plaintiff presents no evidence of when this comment was allegedly made to Blickley, further attenuating the link between this comment and Blickley's decision to change his mind. (Pl.'s Interrogs. 10 ("I am unaware of when this [allegedly prejudicial comment] was told to Sgt. Blickley.").)

Third, and perhaps most importantly, plaintiff argues that Blickley's sudden reversal of opinion is suspicious because plaintiff was led to believe that his performance was satisfactory throughout his probationary period—culminating with Blickley's August 4, 2005 recommendation that plaintiff pass probation—and that he was not apprised of performance deficiencies or given an opportunity to improve. (Pl.'s Resp. 7 ("Plaintiff's overall rating after his first year of probation . . . was that his [sic] '[m]eets standards'"); Blickley Memo. to Harran, Aug. 4, 2005, Ex. 17 to Defs.' Mot. ("It is my opinion that Ofc. Dawson's overall job performance is satisfactory and meets standard performance.").)

However, the Court rejects this argument as unsubstantiated by the record. In particular, the record demonstrates that throughout his probationary period, plaintiff received evaluations that noted specific areas in which plaintiff needed to improve his performance, namely: listening for, comprehending, and responding to radio communications (Weekly Observation Report Nos. 3–4, Sept. 26, 2004, Ex. 9 to Defs.' Mot.; Weekly Observation Report No. 6, Oct. 10, 2004, Ex. 10 to Defs.' Mot.; Weekly Observation Report Nos. 7–8, Oct. 27, 2004, Ex. 11 to Defs.' Mot.;

14

Weekly Observation Report Nos. 9–10, Nov. 8, 2004, Ex. 12 to Defs.' Mot.; Blickley

Probationary Review Performance Evaluation, June 1, 2005, Ex. 13 to Defs.' Mot.); decreasing

the amount of time spent on report writing and increasing his overall productivity (Weekly

Observation Report Nos. 7–8; Blickley Probationary Review Performance Evaluation; Harran

Memo. to File, June 6, 2005, Ex. 16 to Defs.' Mot.; Blickley Memo. to Harran of Aug. 4, 2005);

decreasing cell phone usage (Weekly Observation Report Nos. 9–10); prioritizing arrests and

other urgent assignments over completion of paper work and other non-urgent assignments

(Blickley Probationary Review Performance Evaluation); being organized, prompt, and avoiding

scheduling conflicts (Blickley Probationary Review Performance Evaluation; Harran Memo. to

File); and gaining proficiency with arrest and other police policies and procedures (Blickley

Memo. to Harran of Aug. 4, 2008).

Moreover, during the last ten days of his probation—from August 4th to August

15th—plaintiff committed significant errors involving those same problem areas, including, *inter

alia*: the August 5, 2005 "Linconia Avenue" Incident where plaintiff failed to properly complete

a police report as the primary officer on the scene after an armed robbery (Blickley Memo. to

Moran, Aug. 8, 2005, Ex. 18 to Defs.' Mot. (detailing the content that was missing from

plaintiff's report of the incident, including, *inter alia*, the type of weapon possessed by the

suspect, the fact of a forced entry into the residence, whether there were witnesses, and that there

was an outstanding arrest warrant for the suspect); Harran Memo. to Dawson, Aug. 10, 2005, Ex.

19 to Defs.' Mot. (proposing disciplinary charges against plaintiff for the Linconia Avenue

Incident)); the August 15, 2005 Attempted Suicide Call during which plaintiff's police report

lacked critical information (Blickley Dep. 57:6–22 (stating that plaintiff failed to "mention in the

report . . . [the victim's] age . . . [or whether a] parent or guardian [was] on the scene"); Blickley Memo. to Harran, Aug. 14, 2005, Ex. 23 to Defs.' Mot. (explaining plaintiff's errors and omissions when writing the police report for this incident and expressing concern that the report was "unacceptable documentation of the attempted suicide of a 13 year old girl")); and plaintiff's failure to respond on the evening of August 15th to several pressing calls over the police radio because plaintiff spent two hours writing an arrest report (Blickley Dep. 80:2–82:12 (describing incident where plaintiff failed to respond to numerous urgent calls and Blickley discovered that plaintiff had been at the office working on one report for a DUI arrest instead of prioritizing responding to the calls); Blickley Memo. to Harran, Aug. 15, 2005, Ex. 23 to Defs.' Mot. (describing in further detail plaintiff's failure to prioritize calls while taking an excessive period of time to draft a police report)).

Not only was plaintiff informed of these shortcomings, (see, e.g., Blickley Dep. 30:12–31:22 (stating that weekly evaluation reports were discussed with plaintiff); Blickley Dep. 81:10–14 (stating that Blickley spoke to plaintiff about plaintiff's failure to respond to police calls on the evening of August 15th when he spent two hours writing up an arrest report); Harran Memo. to File (describing conversation defendant Harran and Blickley had with plaintiff during which plaintiff's performance deficiencies were discussed); Blickley Memo. to Moran (noting that Blickley spoke to plaintiff about the insufficient police report of the Linconia Avenue Incident); Blickley Memo. to Harran, Aug. 13, 2005, Ex. 20 to Defs.' Mot. (explaining performance problems that were discussed with plaintiff); Blickley Memo. to Harran, Aug. 14, 2005, Ex. 22 to Defs.' Mot. (stating that Blickley spoke to plaintiff regarding Attempted Suicide Call incident)), but plaintiff also admits to being informed of these shortcomings. (See, e.g.,

Dawson Dep. 26:7–11, 28:17–21, 33:8–10, 37:17–19, 62:25–64:3, 69:6–9, 83:14–20, 192:20–25.)

It is worth noting that the record on summary judgment demonstrates that plaintiff objects not to the facts underlying these incidents, but to his supervisors' assessments of his conduct during these incidents. For instance, with regard to the August 15, 2005 incident during which plaintiff spent two hours writing a police report instead of responding to urgent calls over the police radio, plaintiff admitted that many calls were coming in, including a hit-and-run. (Id. at 190:20–24, 192:1–6.) Indeed, plaintiff admitted that Blickley told him afterward that he should have responded to the calls. (Id. at 192:20–193:21.) However, plaintiff's position was that he had a good reason for taking so long to complete the report. (Id. at 193:1–25.) Likewise, plaintiff testified that despite the criticisms of Blickley and defendant Harran, he "believe[d] [he] was doing exactly what [he] was supposed to be doing" or that he "[doesn't] believe that there is any assignments [sic] that should be pushed away." (Id. at 71:1–62:7, 86:23–24.)

However, the law is clear that it is insufficient to argue that "the employer's decision was wrong or mistaken since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). In this case, there is no evidence from which to infer discriminatory animus. Accordingly, the Court rejects plaintiff's argument on this ground.

> **3.    Defendant Moran's Comment to Plaintiff Was Not Discriminatory in Nature**

As additional evidence of a racial discrimination, plaintiff points to one comment defendant Moran allegedly made to plaintiff two weeks before he began working with defendant Township. In his deposition, plaintiff testified that "[w]hen I was in [defendant Moran's] office,

17

he said, Congratulations on being hired. If they think we hired you because you are black, they are mistaken." (Dawson Dep. 51:12–16.) Plaintiff argues that this comment is direct evidence of racial discrimination and that "[i]t is beyond preamble [sic] that direct evidence of racial discrimination is also sufficient to overcome summary judgment." (Id. at 10.) The Court rejects this argument.

The Moran comment, without more, does not constitute direct evidence of racial discrimination. To the contrary, the comment plainly states that race was not a factor in the decision to hire plaintiff. Plaintiff provides no evidence of the context in which this statement was made or to whom defendant Moran was referring when he stated "they are mistaken." Because this comment, on its face, neither presents direct evidence of racial discrimination nor gives rise to an inference of discriminatory motive, the Court rejects plaintiff's argument on this ground. Accordingly, the Court grants defendants' Motion for Summary Judgment with respect to Counts I and II of the Complaint.

**B.      Section 1981(a) Claim (Count III)**

In Count III of the Complaint, plaintiff alleges that his contractual rights as an employee were violated on account of his race contrary to 42 U.S.C. § 1981(a). (Compl. ¶¶ 68-72.) Plaintiff filed suit against defendant Township and defendants Harran and Moran in their individual and official capacities. In its Order and Memorandum of May 5, 2008, the Court dismissed plaintiff's claims against defendants Harran and Moran in their official capacities as duplicative of plaintiff's claim against defendant Township—the municipal employer of defendants Harran and Moran. What remains of Count III is plaintiff's § 1981 claim against defendant Township and defendants Harran and Moran in their individual capacities.

18

Section 1981, as amended, provides:

> All persons within the jurisdiction of the United States shall have the same
> right in every State and Territory to make and enforce contracts, to sue, be
> parties, give evidence, and to the full and equal benefit of all laws and
> proceedings for the security of persons and property as is enjoyed by white
> citizens, and shall be subject to like punishment, pains, penalties, taxes,
> licenses, and exactions of every kind, and no other.

42 U.S.C. § 1981.

Defendants argue that plaintiff's § 1981 claim should be dismissed because "the most

recent decisions in this District"—the Eastern District of Pennsylvania—"have held there is no

independent cause of action under 42 U.S.C. § 1981 against state actors." (Defs.' Mot. 53.) In his

Response, plaintiff does not address this argument, stating only that "[p]laintiff has sued under

the Reconstruction Era § 1981" and that § 1981 claims should be analyzed under the Title VII

and PHRA framework. (Pl.'s Resp. 16.)

### 1.      § 1981 Claim Against Defendant Township

The Supreme Court held in Jett v. Dallas Indep. Sch. Dist. that § 1983 provides the

exclusive remedy for claims against state actors for violations of individual rights. 491 U.S. 701,

731–32 (1989). Thus, suits against state actors, such as municipalities, could not proceed under

§ 1981. Id. at 731. However, Congress amended § 1981 in 1991, causing courts to split on the

continued validity of the Supreme Court's holding in Jett. See, e.g., Roadcloud v. Pa. Bd. of

Prob. & Parole, No. 05-3787, 2006 WL 83453, *3 (E.D. Pa. Jan. 6, 2006) (noting this split and

citing cases on both sides of the issue).

In January 2009, the Third Circuit weighed in on the issue and joined five circuits in

holding that the 1991 amendments to § 1981 did not overrule the Supreme Court ruling in Jett.

McGovern v. City of Philadelphia, 554 F.3d 114, 115 (3d Cir. 2009). Specifically, the Third

Circuit stated: "because Congress neither explicitly created a remedy against state actors under § 1981(c), nor expressed its intent to overrule *Jett*, we hold that 'the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.'" Id. at 120–21 (quoting Jett, 491 U.S. at 733); see also Sindram v. Fox, No. 07-222, 2009 WL 541578, *3 (E.D. Pa. Feb. 26, 2009) (citing McGovern for the position that § 1981 claims cannot be brought against state actors).

In light of the Third Circuit's holding in McGovern, plaintiff cannot sustain an action against defendant Township, a state actor, under § 1981. Thus, the Court grants defendants' Motion for Summary Judgment with respect to the claim in Count III against defendant Township.

### 2.      § 1981 Claim Against Defendants Harran and Moran

In Count III of the Complaint, plaintiff also asserts his § 1981 claim against defendants Harran and Moran in their individual capacities.

Claims against private actors brought under § 1981 are analyzed under the same framework as Title VII discrimination claims. See Fullard v. Argus Research Labs., Inc., No. 00-509, 2001 WL 632932, *1 (E.D. Pa. June 6, 2001) ("The legal standard for a section 1981 case is identical to the standard in a Title VII case.") (citing Lewis v. University of Pittsburgh, 725 F.2d 910, 915 n.5 (3d Cir. 1983); Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 485 (E.D. Pa. 1999)).

In Part IV.A., *supra*, the Court concluded that plaintiff failed to establish a *prima facie* case of discrimination under Title VII and the PHRA against defendant Township. With respect to his § 1981 claim, plaintiff presents no additional evidence concerning defendants Harran or

20

Moran that would give rise to an inference that they discriminated against plaintiff.

For the same reasons discussed in Part IV.A., *supra*, the Court concludes that plaintiff has failed to establish a *prima facie* case of discrimination against defendants Harran and Moran under § 1981. Accordingly, the Court grants defendants' Motion for Summary Judgment with respect to Count III against defendants Harran and Moran.

**V.      Conclusion**

For all the foregoing reasons, the Court grants defendants' Motion for Summary Judgment. An appropriate Order follows.